CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JAN 0 7 2009

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LORI WOODS,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00015 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I affirm the final decision of the Commissioner denying benefits

## *I. Background and Standard of Review*

The plaintiff, Lori Woods, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Woods' claim for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

1

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Woods filed her applications for SSI and DIB on July 1, 2005, alleging disability as of October 27, 2004, due to asthma, chronic obstructive pulmonary disease, tendonitis in her arms, acid reflux and high cholesterol.[1] (Record, ("R."), at 45, 322-346.) The claims were denied initially on November 3, 2005, and upon reconsideration on January 6, 2006. (R. at 45, 305-313.) Woods then requested a hearing before an administrative law judge, ("ALJ"), on January 17, 2006. (R. at 45.) A hearing was held before the ALJ on September 7, 2006, at which Woods was represented by counsel. (R. at 566-589.)

By decision dated November 8, 2006, the ALJ denied Woods' claims. (R. at 42-55.) The ALJ found that Woods met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2008. (R. at 47.) The ALJ found that Woods had not engaged in substantial gainful activity since October 27, 2004, the alleged onset date. (R. at 47.) The ALJ found that the medical evidence established that Woods had severe respiratory impairments, but he found that Woods' impairments did not meet or medically equal the

---

[1] Woods filed prior applications for SSI and DIB on February 13, 2003. (R. at 92-94, 281-284.) These applications were denied initially, (R. at 64-68, 286-290), and on reconsideration. (R. at 70-72, 292-294.) The ALJ found Woods was not under a disability on October 26, 2004. (R. at 29-41.) The Appeals Council denied Woods' request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 10-13.) There is no indication that Woods pursued this claim any further.

2

requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 47-50.) The ALJ also found that Woods retained the residual functional capacity to perform the exertional demands of a wide range of light[2] work, which did not require him to work around irritants such as fumes, odors, dusts, gases, or poor ventilation. (R. at 51.) The ALJ found that Woods was able to occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand/walk about six hours in an eight hour workday, and sit about six hours in an eight hour workday. (R. at 51.) Thus, the ALJ found that Woods could not perform any of her past relevant work. (R. at 54.) Based on Woods' age, education, work experience and residual functional capacity, as well as the testimony of a vocational expert, the ALJ concluded that Woods could perform jobs existing in significant numbers in the national economy, including those of a hand/packer inspector, general office clerk and a ticket taker. (R. at 54-55.) Therefore, the ALJ found that Woods was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 26-27.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Woods pursued her administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 28.) The Appeals Council denied Woods' request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 18-21) *See* 20 C.F.R. § 404.981, 416.1481 (2008). Woods then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). The case is currently before

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

this court on Woods' motion for summary judgment, filed October 30, 2008, and on the Commissioner's motion for summary judgment, filed November 25, 2008.

## II. Facts

Woods was born in 1963, which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c), 416.963(c). (R. at 54.) According to the record, Woods completed the eleventh grade in school in regular classes, and has past relevant work experience as a housekeeper and as a machine operator. (R. at 54.)

At Woods' hearing before the ALJ on September 7, 2006, she testified that although she had only completed the eleventh grade, she attempted to attend an adult high school program to get her general equivalency development diploma, however, she had two children and encountered some difficulty completing and understanding the required material. (R. at 573.) Woods stated that she had not worked over the past four years. (R. at 573.) Woods further stated that she suffered from shortness of breath, which required her to take breathing treatments. (R. at 574.) Woods noted that such treatments made her chest "feel like it's going to collapse, like it's a weight on it." (R. at 574.) When asked how many treatments per day she must take, Woods responded that she used a nebulizer every four hours, between four to six times per day, and an inhaler sometimes 10 to 12 times per day. (R. at 574.) Woods noted that her condition caused her to get very tired, but she explained that she had difficulties sleeping because the nebulizer made her "jittery and jumpy." (R. at 574.) She stated that the daily use of the nebulizer cased periodic fatigue. (R. at 574.) Woods further noted that her condition required her to lay down about five to six times per day to rest, noting

4

that if she was able to fall asleep, she could not sleep very long. (R. at 574.)

Woods noted that she experienced abdominal discomfort, perhaps for being too heavy. (R. at 575.) She noted that her weight had fluctuated upward to over 200 pounds, explaining that her normal weight ranged between 170 and 180 pounds. (R. at 575.) Woods also stated that she had suffered from various infections, such as upper respiratory infections and asthmatic bronchitis. (R. at 575-576.) Woods stated that the infections occurred quite often in the winter and occasionally in the summer. (R. at 576.) Woods also noted that she experienced headaches, which originate in the back of her neck. According to Woods, her doctor attributed the headaches to a possible neck injury she sustained in the past. (R. at 576.) Woods stated that she experienced headaches on a weekly basis and noted that they usually last for about two days on average. (R. at 576.) Woods indicated that, upon the onset of a headache, she takes Advil and other medication that her doctor had recommended and also tries to lay down and rest. (R. at 577.) Woods noted that the Advil seemed to be more effective than the other medications. (R. at 577.)

Woods also noted that she experienced leg discomfort, which her doctor said could be a result of diabetes. (R. at 577.) Woods noted that the discomfort occurred in the top part of her leg, from her hip to her knee, causing the top of her skin to go numb, and a burning sensation underneath the skin. (R. at 577.) Woods stated that the pain occurred daily, particularly if she stands for extended periods, or lays in a certain position. (R. at 577.) Woods noted that the condition caused difficulty walking, making her feel like she has "rocks up in [her] heels at times." (R. at 578.) In addition, Woods noted that she suffered hip discomfort as well,

5

which she said was exacerbated depending upon her position. (R. at 578.) Woods also stated that she often lost strength in her arms and hands, particularly in her right hand. (R. at 578.) Woods also noted that she had open heart surgery when she was five years old. (R. at 579.)

Considering all of her problems, Woods testified that although she has both good and bad days, she probably has more bad days than good. (R. at 579.) She stated that on her bad days, her whole body hurts and aches, and that she cannot breathe and she does not "feel like doing anything." (R. at 579.) On her good days, Woods stated that she can perform her normal everyday routine. (R. at 579.)

When asked by the ALJ about her heart, Woods stated that she was not being treated for a heart condition, nor was she taking any medications for her heart. (R. at 580.) Woods further stated that she had not complained of any symptoms related to her heart for a long time. (R. at 580.) Woods explained that she had suffered from her other conditions for about three years. (R. at 581.) When asked if her condition had worsened since her previous hearing in August 2004, Woods stated that her condition had changed, in that her oxygen level has dropped. (R. at 581.) Woods further stated that doctors at Rockingham Memorial Hospital, ("RMH"), told her that her oxygen level would continue to drop. (R. at 581.) In addition, Woods noted that since her previous hearing before an ALJ, her lung has partially collapsed, and she has been hospitalized with cardiopulmonary disease, ("COPD"). (R. at 581.) Since this hospitalization, Woods stated that she has become diabetic. (R. at 581.) Woods noted that, at the time of the hearing, she was not taking any insulin or other medication for her diabetes, but she has to check her blood sugar four times per day. (R. at 581.)

6

Bonnie Martindale, a vocational expert, also testified at Woods's hearing. (R. at 582.) Martindale identified Woods' past relevant work as both a hospital housekeeper and a machine operator as medium,[3] unskilled work. (R. at 584.) The ALJ then asked Martindale to consider a hypothetical claimant of the same age, education and past work experience as Woods. (R. at 584.) In addition, the ALJ asked Martindale to assume that such an individual would retain the capacity to perform work at the levels indicated in Exhibit B3-F.[4] (R. at 584.) Based on the findings in Exhibit B3-F, Martindale opined that such an individual could perform work at the "light capacity" and clearly would be unable to perform her past work. (R. at 585.) Based upon this hypothetical, the ALJ asked Martindale to identify any other jobs that such an individual could perform. (R. at 585.) Martindale opined that there were jobs, both regionally and nationally, that a person with such restrictions could perform, including jobs as a hand packager, a general office clerk and a ticket taker. (R. at 585-586.) Martindale noted that there are over 443,000 hand packager jobs nationally and over 8,400 in Virginia in the light category. (R. at 585.) In addition, Martindale opined that such an individual could perform the job of a general office clerk, of which there are over 285,000 jobs nationally and over 8,400 jobs in Virginia. (R. at 585-586.) Martindale further opined that such an individual could perform the job of a ticket taker, of which there are over 109,000 jobs nationally, and over 3,300 jobs in Virginia. (R. at 586.)

The ALJ next asked Martindale to incorporate the limitations shown by Dr.

---

[3] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he also can do light work or sedentary work. *See* 20 C.F.R. § 404.1567(c), 416.967(c) (2008).
[4] This exhibit consists of an RFC (Physical), completed by DDS physician dated October 24, 2005.

7

Hoffman in a mental and physical residual functional capacity, ("RFC") evaluation, and whether it would change the individual level of capacity. (R. at 586.) Martindale stated that it would change the level of capacity to "sedentary." (R. at 587.) Martindale noted that the RFC stated "poor or none" as to the individual's ability to maintain attention and concentration. (R. at 587.) Martindale opined that such mental characteristics might impact even an unskilled office job, because the person would still be required to maintain attention and concentration, and stay on task. (R. at 587.)

The ALJ next asked Martindale to assess Woods' ability to work based on a third hypothetical. The ALJ asked the vocational expert to accept the limitations as fully credible and to consider Woods' testimony regarding her impairments to be supported by objective medical evidence, including the following: restrictions in her abilities to sit, stand, walk, lift and carry; the effect of her conditions on her ability to maintain attention, concentration, persistence and pace; the fact that she has fatigue and decreased stamina; her problems sleeping and having to rest for the frequency, duration and intervals indicated; that she has exacerbations of her breathing disorder to the extent that she would have to miss work more than two days in a month on an average basis. (R. at 588.) Martindale agreed that these restrictions and difficulties would preclude Woods from all work. (R. at 588.)

In rendering his decision, the ALJ reviewed records from Dr. Harold Huffman, M.D.; Dr. James Long, M.D.; Rockingham Memorial Hospital; Augusta Medical Center; Dr. Syed S. Hassan, M.D., a state agency physician; Dr. William Amos, M.D., a state agency physician; and Jena L. Crisler, D.O.

8

Woods received treatment from Dr. Huffman between August 22, 2003, through November 10, 2005, for various symptoms, including coughing, wheezing, problems with both arms, chronic asthma, GERD, congestion, COPD and early diabetes mellitus. (R. at 301-302, 465-466.) On January 11, 2005, Woods presented to Dr. Huffman with cough and congestion, which had been present for the previous three weeks. (R. at 302, 466.) Dr. Huffman diagnosed her with asthmatic bronchitis and prescribed doxycycline. (R. at 466.) On April 21, 2005, Woods presented to Dr. Huffman stating that she had been hospitalized overnight two weeks prior to the visit to be treated for her COPD. (R. at 302, 466.) Woods stated that she was also having trouble with wheezing in spite of being on five different inhalers. (R. at 466.) She also stated that, while hospitalized, it was discovered that she had an elevated blood sugar level. (R. at 466.) Dr. Huffman diagnosed her with COPD and early diabetes mellitus and instructed her on a diet, advising her to continue with the inhalers she had been using. (R. at 466.) From May 16, 2005, to October 21, 2005, Woods received several different refills of her prescribed medication, which consisted of Aciphex, amoxicillin and several different inhalers. (R. at 466.) On November 10, 2005, Woods presented to Dr. Huffman to have paperwork completed for Social Services. (R. at 466.) Dr. Huffman noted that Woods had recently been in the hospital with COPD and that Woods was to treat the condition on medication. (R. at 466.) In addition, Dr. Huffman noted that Woods continued to smoke. (R. at 466.)

On January 11, 2005, Dr. Huffman completed a Medical Assessment of Ability to do Work-Related Activities (Mental), where he opined that in the category of making occupation adjustments, Woods had an unlimited/very good ability to follow work rules, relate to co-workers, interact with supervisors and deal

9

with work stresses; a good ability to deal with the public; a fair ability to used judgment with the public and function independently; and a poor/none ability to maintain attention and concentration. (R. at 296.) In the category of making performance adjustments, Dr. Huffman opined that Woods had a good ability to understand, remember and carry out simple job instructions and a poor/none ability to understand, remember and carry out complex job instructions and detailed, but not complex, job instructions. (R. at 297.) In the category of making personal-social adjustments, Dr. Huffman opined that Woods had an unlimited/very good ability to behave in an emotionally stable manner and demonstrate reliability and a good ability to maintain personal appearance and relate predictably in social situations. (R. at 297.) With regard to Woods' physical limitations, Dr. Huffman opined that she could lift/carry a maximum of five pounds; stand/walk for a total of one to two hours in an eight hour workday, fifteen minutes of which would be without interruption; never climb or crawl; only occasionally stoop, kneel and/or crouch; limited in her ability to reach and push/pull; and environmental restrictions in regard to exposure to heights, temperature extremes, chemicals, dust, noise, fumes and humidity. (R. at 298-299.)

On April 4, 2005, Woods presented to Rockingham Memorial Hospital with complaints of difficulty breathing. (R. at 509-521.) Woods stated that she became sick about three or four weeks prior this April 2005 visit. (R. at 509.) She further stated that she had been wheezing and short of breath, in addition to experiencing a cough, body aches, headaches, nausea, chills, sore ribs and heartburn. (R. at 509.) Woods denied other chest or abdominal pain, and indicated that she had only vomited once several days prior to the visit. (R. at 509.) It was noted that Woods had a history of asthma, hypertension and reflux, and she was on multiple

10

medications, including nebulizers. (R. at 509.) Chest x-rays showed no acute process and were negative for Influenza A and B. (R. at 509.) Woods was given Albuterol and Atrovent nebulizers, as well as Solumedrol. (R. at 509.) Woods' final diagnosis was viral bronchitis and bronchospasm. (R. at 509.) Woods was prescribed prednisone 60 mg daily for four days and advised to continue nebulizer treatments at home. (R. at 510.)

On April 9, 2005, Woods was admitted to Rockingham Memorial Hospital with complaints of wheezing, hoarseness and coughing. (R. at 363-378.) Woods stated that the day before she had noticed her coughing increasing consistently, causing hoarseness and impairing her ability to speak. (R. at 363.) Woods stated that she did not go to a primary care physician because she did not have the money to pay upfront, so she came to the Emergency Department the previous Monday and received three Nebulizer treatments, as well as a steroid shot and was sent home on prednisone. (R. at 363.) Woods also stated that when she coughed, she experienced some urinary incontinence. (R. at 363.) In the Emergency Department, Woods had laboratory work performed including a chest x-ray that showed mild chronic parenchymal changes and no acute cardiopulmonary process. (R. at 363.)

Woods' history and physical examination report noted her past medical history, which was significant for COPD and asthma that was diagnosed two years ago; open-heart surgery for patient ductus when she was five years old; a total hysterectomy due to benign tumor of the uterus and cholecystectomy in 1992; past fractures of toes in her feet bilaterally on different occasions with a history of hypertension and hyperlipidemia; and gastroesophageal reflux disease. (R. at 367.)

11

It also was noted that Woods had smoked about one to two cigarettes a day since she started feeling ill, that she did not consume any alcohol and that she was currently unemployed. (R. at 367.) Woods' final diagnoses were exacerbation of COPD with an asthmatic component, hyperglycemia on steroids, obesity, hypertension, gastroesophageal reflux disease, hyperlipidemia, tobacco abuse and hoarseness due to coughing. (R. at 363.) Dr. Reena Rizvi, M.D., Woods' attending physician, noted that she was discharged on April 10, 2005, in a much improved and stable condition. (R. at 363.) Dr. Rizvi provided discharge instructions which advised Woods to use artificial sweeteners, to cut the portions of food in her diet and walk 20 minutes every day in an attempt to lose weight. (R. at 364.) In addition, Woods was to follow up with her primary care physician, Dr. Huffman, in one week, at which time blood sugar testing would be performed. (R. at 364.) It also was advised that Woods should stop smoking. (R. at 364.) Upon discharge, Woods was also prescribed various medications including a NicoDerm patch, Singulair, Spiriva HandiHaler, Zocor and Aciphex. (R. at 364.)

On October 1, 2005, Woods presented to Rockingham Memorial Hospital complaining of a sudden sharp pain in her left ribs. (R. at 495-507.) Woods stated that she had a persistent cough for the two previous days. (R. at 496.) Woods stated she quickly stood up to make some food when she developed a sharp pain over her left lower rib area, noting that it hurt to turn, move or take a deep breath. (R. at 496.) Woods noted that she was free of abdominal pain and chest pain, with no nausea or vomiting. (R. at 496.) Chest x-rays showed no acute pneumonia or rib fractures. (R. at 497.) Woods felt better after receiving Dilaudid and Phenergan. (R. at 497.) Her respiratory symptoms showed deceased air entry secondary to splinting. (R. at 497.) Woods' final assessment indicated that it was

12

a left rib injury and she was prescribed Vicoprofen and told to follow up with her primary care physician. (R. at 497.)

On October 18, 2005, Woods presented to Dr. James Long, M.D., for evaluation of musculoskeletal and respiratory impairments with allegations of disability consequent to asthma, chronic obstructive lung disease, tendonitis in the left arm, acid reflux and high cholesterol. (R. at 379-387.) Dr. Long noted that Woods, who is a 30+ pack per year cigarette smoker, stated that her wheezing and chest congestion developed after having been employed at a plastics plant for about two years, and she cited her work environment as a possible cause for her illness. (R. at 379.) Dr. Long noted that Woods was last hospitalized overnight at RMH because of respiratory distress that occurred about six months prior to her current visit, where she received a systemic steroid taper with close follow up involving scheduled administration of nebulized bronchodilators in addition to aerosolized long-acting coricosteriods, beta-2 agnoists and rescue inhalers. (R. at 379.) Dr. Long stated that Woods described having both good and bad days, where on good days, she was able to tend to her personal needs, which included housework, shopping and driving an automobile. (R. at 379.) On her bad days, Woods stated that she would become so wheezy and congested that she could barely move around. (R. at 379.) Dr. Long noted Woods' other issues, which included dramatic recent weight gain with active gastroesophageal reflux, occasional foot swelling and episodic left shoulder discomfort with radiation into the left elbow, thumb and index finger of the left hand. (R. at 380.) Dr. Long opined that these symptoms may respond to over the counter medications and local measures. (R. at 380.) Otherwise, Dr. Long opined that Woods' foot discomfort after prolonged standing suggested some muscle fatigue, perhaps related to

13

obesity.  (R. at 380.)

Upon examination, Dr. Long noted that Woods had a family history of diabetes and Woods herself noted a blood glucose elevation at the time of her last overnight hospitalization.  (R. at 380.)  Woods' blood pressure was 130/80 and her pulse was 80 and regular.  (R. at 380.)  Among his other observations, Dr. Long noted that Woods' chest wall was thick, consequent to obesity, but her breathing sounds were well-preserved and clear.  (R. at 380.)  Dr. Long noted no wheezing, rales, rhonchi or asymmetry.  (R. at 381.)  Although there was no apparent joint deformity or swelling, Dr. Long noted some slight tenderness about the left forearm muscles, but grip strength seemed well-preserved and no apparent impairment of gross or fine manipulative ability.  (R. at 381.)  Among Dr. Long's clinical impressions were a reactive airway disease with tobacco abuse, obesity and history possibly suggestive of past occupational asthma.  (R. at 381.)  In addition, he noted that Woods seemed reasonably well-compensated and, assuming ongoing tobacco smoke abstinence, she may have a fair to good prognosis.  (R. at 381.)

Dr. Syed S. Hassan, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on October 24, 2005.  (R. at 388-394.)  Dr. Hassan found that Woods could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours in an eight-hour workday and that she had an unlimited ability to push and/or pull.  (R. at 389.)  Dr. Hassan opined that Woods could occasionally climb, balance, stoop, kneel, crouch and crawl.  (R. at 390.)  He imposed no manipulative, visual or communicative limitations.  (R. at 390-391.)  He did note one environmental limitation, which was

14

to avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 391.)

Dr. Hassan also noted that Woods' subjective allegations were only partially credible. (R. at 393.) Among these subjective allegations made by Woods included claims that she had difficulty lifting, symptoms of pain in her hips and legs, alleged numbness in her legs, pain that shoots from her hip down toward her feet, in addition to leg cramps that move to different locations. (R. at 393.) Dr. Hassan found that Woods' activities of daily living form indicated that she was able to prepare her meals, in addition to performing household chores such as cleaning the house and washing her clothes. (R. at 393.) Dr. Hassan also found that Woods was able to shop for groceries, read, watch television, talk on the phone and that she got along with authority figures well. (R. at 393.)

On October 25, 2005, Woods again presented to Rockingham Memorial Hospital with shortness of breath, wheezing and COPD/bronchitis, and was started on intravenous antibiotics, as well as steroids. (R. at 395-464.) Woods noted that she had been having a cough productive of grey/green sputum and that she had subjective fevers and chills, some intermittent diarrhea, but no constipation. (R. at 398.) Woods also noted achy feelings, wheezing and a decreased exercise tolerance. (R. at 396.) After being there for two days, Woods began to improve, although she contracted influenza during this time. (R. at 396.) John W. Anderson, D.O., the attending physician, noted that Woods was hyperglycemic and a fasting blood sugar showed her glucose to be at 118 after starting intravenous steroids. (R. at 396.) Anderson opined that it would be reasonable to follow up on her diabetes mellitus on an outpatient basis with another fasting glucose after she is

15

off of her rapid steroid taper. (R. at 396.)

Jena L. Crisler, D.O. performed a physical examination of Woods and provided an assessment and plan. (R. at 399.) Crisler noted that Woods had COPD exacerbation probably secondary to bronchitis or possibly pneumonia, which Crisler recommended to support with O2, nebulizers, Xopenex and Atrovent. (R. at 399.) Crisler also noted that Woods had a history of elevated glucose secondary to steroids; however, Woods did not carry the diagnosis of diabetes. (R. at 399.) Crisler also noted elevated cholesterol, tobacco abuse, which would continue to be treated with a nicotine patch, as well as hypertension, which would continue to be treated with Toprol XL. (R. at 399.) The final diagnoses were COPD with bronchitis exacerbation, influenza A, hyperglycemia most likely secondary to steroid use, hyperlipidemia, tobacco abuse, hypertension, history of asthma and gastroesophageal reflux disease. (R. at 396-397.) Woods was discharged on October 27, 2005. (R. at 396.)

On January 4, 2006, Dr. William Amos, M.D., a state agency physician completed a PRFC. (R. at 467-473.) The PRFC stated that Woods could occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, sit, stand and/or walk for a total of six hours in an eight-hour workday and that she had an unlimited ability to push and/or pull. (R. at 468.) It also stated that Woods could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 469.) The PRFC imposed no manipulative, visual or communicative limitations. (R. at 390-469-470.) It did note one environmental limitation, which was to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (R. at 470.)

16

Dr. Amos also noted that Woods' subjective allegations were only partially credible. (R. at 472.) Among these subjective allegations made by Woods included claims of disability due to asthma, COPD, tendonitis of the left arm, acid reflux and high cholesterol. (R. at 472.) In addition, Woods reported that hip pain, leg numbness and leg cramps caused limitations in her ability to stand, walk, lift, carry, climb, concentrate, and complete daily activities. (R. at 472.) The state agency physician found that Woods' activities of daily living form indicated that she was able to prepare her meals, in addition to performing household chores such as cleaning the house and washing her clothes. (R. at 472.) It also was noted that Woods was able to shop for groceries, read, watch television, talk on the phone and that she got along with authority figures well. (R. at 472.)

On March 7, 2006, Woods presented to Augusta Medical Center complaining of left side pain with nausea that had persisted for a week. (R. at 479-487.) At this visit, it was noted that Woods' respiratory symptoms were clear and normal, and her mental status was awake, alert and oriented. (R. at 481.) Chest x-rays showed a mild discoid atelectasis and the final diagnoses were acute musculoskeletal chest pain and acute bronchitis. (R. at 483) In Woods' discharge summary, the doctor stated that her chest pain was due to a problem with the chest wall or ribcage, of which the common causes included bruises, muscle strain from coughing, vomiting or lifting, as well as inflammation of the rib cage from viral infections or arthritis. (R. at 483.) The doctor noted that although icepacks could help with an acute injury, warm moist heat would be of benefit if the symptoms persisted for longer than one or two days. (R. at 483.) The doctor also opined that Woods should quit smoking. (R. at 483.) With regard to her acute bronchitis, the

17

doctor stated that it may be caused by bacterial or viral infections, allergies or inhalations of smoke or other irritating chemicals. (R. at 483.) To treat acute bronchitis, the doctor recommended a number of treatments, including antibiotics, drinking increased fluids, humidifying the air and increased rest. (R. at 483.) On this same day, Woods presented to Rockingham Memorial Hospital with the same complaints of left lateral back and side pain that had persisted for a week and a dry cough. (R. at 489-494.)

Woods continued to receive treatment from Dr. Huffman from January 2, 2006, through August 24, 2006, due to diabetes mellitus, hypertension, COPD, probable arthritis of the cervical and lumbar spine and hydradenitis suppurative. (R. at 522-524.)     On February 17, 2007, Dr. Huffman completed a Medical Assessment of Ability to do Work-Related Activities (Physical), where he opined that Woods was able to lift/carry a maximum of five to ten pounds occasionally and five pounds frequently; stand/walk for a total of two hours in an eight hour workday, two minutes of it without interruption; sit for a total of four hours in an eight hour workday, 30 minutes of it without interruption; never climb or crawl; only occasionally stoop, kneel and/or crouch; frequently balance; limited in her ability to reach and push/pull; and that she suffered from environmental restrictions with regard to exposure to heights, temperature extremes, moving machinery, chemicals, dust, fumes and humidity. (R. at 544-546.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*,

461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Woods v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 8, 2006, the ALJ denied Woods' claims. (R. at 42-55.) The ALJ found that Woods met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2008. (R. at 47.) The ALJ found that Woods had not engaged in substantial gainful activity since October 27, 2004, the alleged onset date. (R. at 47.) The ALJ found that the medical evidence established that Woods had severe respiratory impairments, but

19

he found that Woods' impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 47-50.) The ALJ also found that Woods retained the residual functional capacity to perform the exertional demands of a wide range of light work, which did not require him to work around irritants such as fumes, odors, dusts, gases or poor ventilation. (R. at 51.) The ALJ found that Woods was able to occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand/walk about six hours in an eight hour workday and sit about six hours in an eight hour workday. (R. at 51.) Thus, the ALJ found that Woods could not perform any of her past relevant work. (R. at 54.) Based on Woods' age, education, work experience and residual functional capacity, as well as the testimony of a vocational expert, the ALJ concluded that Woods could perform jobs existing in significant numbers in the national economy, including those of a hand/packer inspector, general office clerk and a ticket taker. (R. at 54-55.) Therefore, the ALJ found that Woods was not under a disability as defined in the Act, and that she was not eligible for benefits. (R. at 26-27.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

Woods argues that the ALJ's decision was not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-12.) Specifically, Woods argues that the ALJ erred by not according proper weight to the opinion of Dr. Huffman, Woods' treating physician. (Plaintiff's Brief at 7-12.) Woods also argues that the ALJ erred by failing to give full consideration to the findings of Dr. Huffman as to the severity of Woods' mental impairments and the resulting affects on Woods' work ability. (Plaintiff's Brief at 10-12.)

20

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Woods argues that the ALJ's decision was not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-12.) Specifically, Woods argues that the ALJ erred by not

Case 2:08-cv-00015-GMW-PMS   Document 18   Filed 01/07/09   Page 21 of 37   Pageid#: 72

according proper weight to the opinion of Dr. Huffman, Woods' treating physician. (Plaintiff's Brief at 7-12.)

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[5] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Although Woods had allegedly received consistent treatment from Dr. Huffman beginning January 19, 2001, the relevant time period starts on October 27, 2004, the date that Woods alleges the onset of her disability. Woods received treatment from Dr. Huffman between November 26, 2004, and November 10, 2005, for various symptoms including coughing, wheezing, problems with both

---

[5] *Hunter* was superseded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

22

arms, chronic asthma, GERD, congestion, COPD and early diabetes mellitus. (R. at 301-302, 465-466.) On January 11, 2005, Woods presented to Dr. Huffman with cough and congestion, which had been present for the previous three weeks. (R. at 302, 466.) Dr. Huffman diagnosed her with asthmatic bronchitis and prescribed doxycycline. (R. at 466.) On April 21, 2005, Woods presented to Dr. Huffman stating that she had been hospitalized overnight two weeks prior to the visit to be treated for her COPD. (R. at 302, 466.) Woods stated that she was also having trouble with wheezing in spite of being on five different inhalers. (R. at 466.) She also stated that, while hospitalized, it was discovered that she had an elevated blood sugar level. (R. at 466.) Dr. Huffman diagnosed her with COPD and early diabetes mellitus and instructed her on a diet, advising her to continue with the inhalers she had been using. (R. at 466.) From May 16, 2005, to October 21, 2005, Woods received several different refills of her prescribed medication, which consisted of Aciphex, amoxicillin and several different inhalers. (R. at 466.) On November 10, 2005, Woods presented to Dr. Huffman to have paperwork completed for Social Services. (R. at 466.) Dr. Huffman noted that Woods had recently been in the hospital with COPD and that Woods was to treat the condition on medication. (R. at 466.) In addition, Dr. Huffman noted that Woods continued to smoke. (R. at 466.)

On January 11, 2005, Dr. Huffman completed a Medical Assessment of Ability to do Work-Related Activities (Mental), where he opined that in the category of making occupation adjustments, Woods had an unlimited/very good ability to follow work rules, relate to co-workers, interact with supervisors and deal with work stresses; a good ability to deal with the public; a fair ability to use judgment with the public and function independently; and a poor/none ability to

23

maintain attention and concentration. (R. at 296.) In the category of making performance adjustments, Dr. Huffman opined that Woods had a good ability to understand, remember and carry out simple job instructions and a poor/none ability to understand, remember and carry out complex job instructions and detailed, but not complex, job instructions. (R. at 297.) In the category of making personal-social adjustments, Dr. Huffman opined that Woods had an unlimited/very good ability to behave in an emotionally stable manner and demonstrate reliability and a good ability to maintain personal appearance and relate predictably in social situations. (R. at 297.) With regard to Woods' physical limitations, Dr. Huffman opined that she could lift/carry a maximum of five pounds; stand/walk for a total of one to two hours in an eight hour workday, 15 minutes of which would be without interruption; never climb or crawl; only occasionally stoop, kneel and/or crouch; limited in her ability to reach and push/pull; and environmental restrictions in regard to exposure to heights, temperature extremes, chemicals, dust, noise, fumes and humidity. (R. at 298-299.)

Woods continued treatment by Dr. Huffman from January 2, 2006, through August 24, 2006, due to diabetes mellitus, hypertension, COPD, probable arthritis of the cervical and lumbar spine and hydradenitis suppurative. (R. at 522-524.) On February 17, 2007, Dr. Huffman completed a Medical Assessment of Ability to do Work-Related Activities (Physical), where he opined that Woods was able to lift/carry a maximum of five to 10 pounds occasionally and five pounds frequently; stand/walk for a total of two hours in an eight hour workday, two minutes of it without interruption; sit for a total of four hours in an eight hour workday, 30 minutes of it without interruption; never climb or crawl; only occasionally stoop, kneel and/or crouch; frequently balance; limited in her ability to reach and

24

push/pull; and that she suffered from environmental restrictions with regard to exposure to heights, temperature extremes, moving machinery, chemicals, dust, fumes and humidity. (R. at 544-546.)

The court finds that the ALJ properly accorded little weight to the opinion of Dr. Huffman, as substantial evidence supports the ALJ's RFC assessment for a wide range of light work. In determining that Woods retained the residual functional capacity for light work, with no activities around dust or other respiratory irritants and exposure to temperature extremes, (R. at 51), the ALJ's finding was consistent with Woods' other treating physician, Dr. Long, as well as the state agency physicians, Dr. Hassan and Dr. Amos.

As summarized earlier, Woods presented to Dr. Long for evaluation of musculoskeletal and respiratory impairments with allegations of disability consequent to asthma, chronic obstructive lung disease, tendonitis in the left arm, acid reflux and high cholesterol. (R. at 379-387.) Dr. Long noted that Woods, who is a 30+ pack per year cigarette smoker, stated that her wheezing and chest congestion developed after having been employed at a plastics plant for about two years, and she cited her work environment as a possible cause for her illness. (R. at 379.) Dr. Long noted that Woods was last hospitalized overnight at RMH because of respiratory distress that occurred about six months prior to her current visit, where she received a systemic steroid taper with close follow up involving scheduled administration of nebulized bronchodilators in addition to aerosolized long-acting coricosteriods, beta-2 agnoists and rescue inhalers. (R. at 379.) Dr. Long stated that Woods described having both good and bad days, where on good days, she was able to tend to her personal needs, which included housework,

25

shopping and driving an automobile. (R. at 379.) On her bad days, Woods stated that she would become so wheezy and congested that she could barely move around. (R. at 379.) Dr. Long noted Woods' other issues, which included dramatic recent weight gain with active GERD, occasional foot swelling and episodic left shoulder discomfort with radiation into the left elbow, thumb and index finger of the left hand. (R. at 380.) Dr. Long opined that these symptoms may respond to over the counter medications and local measures. (R. at 380.) Otherwise, Dr. Long opined that Woods' foot discomfort after prolonged standing suggested some muscle fatigue, perhaps related to obesity. (R. at 380.)

Upon examination, Dr. Long noted that Woods had a family history of diabetes and Woods herself noted a blood glucose elevation at the time of her last overnight hospitalization. (R. at 380.) Woods' blood pressure was 130/80 and her pulse was 80 and regular. (R. at 380.) Among his other observations, Dr. Long noted that Woods' chest wall was thick, consequent to obesity, but her breathing sounds were well-preserved and clear. (R. at 380.) Dr. Long noted no wheezing, rales, rhonchi or asymmetry. (R. at 381.) Although there was no apparent joint deformity or swelling, Dr. Long noted some slight tenderness about the left forearm muscles, but grip strength seemed well-preserved and there was no apparent impairment of gross or fine manipulative ability. (R. at 381.) Among Dr. Long's clinical impressions were a reactive airway disease with tobacco abuse, obesity and history possibly suggestive of past occupational asthma. (R. at 381.) In addition, he noted that Woods seemed reasonably well-compensated and, assuming ongoing tobacco smoke abstinence, she may have a fair to good prognosis. (R. at 381.)

In addition to Dr. Long's examination, Woods received other physical examinations after presenting to RMH on several occasions, as well as to Augusta Medical Center. On April 9, 2005, Woods was admitted to RMH with complaints of wheezing, hoarseness and coughing. (R. at 363-378.) Woods stated that the day before she had noticed her coughing increasing consistently, causing hoarseness and impairing her ability to speak. (R. at 363.) Woods also stated that when she coughed, she has some urinary incontinence. (R. at 363.) In the Emergency Department, Woods had laboratory work done that included a chest x-ray that showed mild chronic parenchymal changes and no acute cardiopulmonary process. (R. at 363.)

Woods' history and physical examination report noted her past medical history, which was significant for COPD and asthma that was diagnosed two years ago; open-heart surgery for patient ductus when she was five years old; a total hysterectomy due to benign tumor of the uterus and cholecystectomy in 1992; past fractures of toes in her feet bilaterally on different occasions with a history of hypertension and hyperlipidemia; and GERD disease. (R. at 367.) It also noted that Woods had smoked about one to two cigarettes a day since she started feeling ill, that she did not consume any alcohol and that she was currently unemployed. (R. at 367.) Woods' final diagnoses were exacerbation of COPD with an asthmatic component, hyperglycemia on steroids, obesity, hypertension, GERD, hyperlipidemia, tobacco abuse and hoarseness due to coughing. (R. at 363.) Dr. Reena Rizvi, M.D., Woods' attending physician, noted that she was discharged on April 10, 2005, in a much improved and stable condition. (R. at 363.) Dr. Rizvi provided discharge instructions which advised Woods to use

27

artificial sweeteners, to cut the portions of food in her diet and walk 20 minutes every day in an attempt to lose weight. (R. at 364.) In addition, Woods was to follow up with her primary care physician, Dr. Huffman, in one week, at which time blood sugar testing would be performed. (R. at 364.) It also was advised that Woods should stop smoking. (R. at 364.) Upon discharge, Woods was also prescribed various medications including a NicoDerm patch, Singulair, Spiriva HandiHaler, Zocor and Aciphex. (R. at 364.)

On October 1, 2005, Woods presented to RMH complaining of a sudden sharp pain in her left ribs. (R. at 495-507.) Woods stated that she had a persistent cough for the two previous days. (R. at 496.) Woods stated she quickly stood up to make some food when she developed a sharp pain over her left lower rib area, noting that it hurt to turn, move or take a deep breath. (R. at 496.) Woods noted that she was free of abdominal pain and chest pain, with no nausea or vomiting. (R. at 496.) Chest x-rays showed no acute pneumonia or rib fractures. (R. at 497.) Woods felt better after receiving Dilaudid and Phenergan. (R. at 497.) Her respiratory symptoms showed deceased air entry secondary to splinting. (R. at 497.) Woods' final assessment indicated that it was a left rib injury and she was prescribed Vicoprofen and told to follow up with her primary care physician. (R. at 497.)

On October 25, 2005, Woods again presented to RMH with shortness of breath, wheezing and COPD/bronchitis, and was started on intravenous antibiotics, as well as steroids. (R. at 395-464.) Woods noted that she had been having a cough productive of grey/green sputum and that she had subjective fevers and chills, some intermittent diarrhea, but no constipation. (R. at 398.) Woods also

28

noted achy feelings, wheezing and a decreased exercise tolerance. (R. at 396.) After being there for two days, Woods began to improve, although she contracted influenza during this time. (R. at 396.) John W. Anderson, D.O., the attending physician, noted that Woods was hyperglycemic and a fasting blood sugar showed her glucose to be at 118 after starting intravenous steroids. (R. at 396.) Anderson opined that it would be reasonable to follow up on her diabetes mellitus on an outpatient basis with another fasting glucose after she is off of her rapid steroid taper. (R. at 396.)

Jena L. Crisler, D.O., performed a physical examination of Woods and provided an assessment and plan. (R. at 399.) Crisler noted that Woods had COPD exacerbation probably secondary to bronchitis or possibly pneumonia, which Crisler recommended to support with O2, nebulizers, Xopenex and Atrovent. (R. at 399.) Crisler also noted that Woods had a history of elevated glucose secondary to steroids; however, Woods did not carry the diagnosis of diabetes. (R. at 399.) Crisler also noted elevated cholesterol, tobacco abuse, which would continue to be treated with a nicotine patch, as well as hypertension, which would continue to be treated with Toprol XL. (R. at 399.) The final diagnoses were COPD with bronchitis exacerbation, influenza A, hyperglycemia most likely secondary to steroid use, hyperlipidemia, tobacco abuse, hypertension, history of asthma and GERD. (R. at 396-397.) Woods was discharged on October 27, 2005. (R. at 396.)

On March 7, 2006, Woods presented to Augusta Medical Center complaining of left side pain with nausea that had persisted for a week. (R. at 479-487.) At this visit, it was noted that Woods' respiratory symptoms were clear and

29

normal, and her mental status was awake, alert and oriented. (R. at 481.) Chest x-rays showed a mild discoid atelectasis and the final diagnoses were acute musculoskeletal chest pain and acute bronchitis. (R. at 483) In Woods' discharge summary, the doctor stated that her chest pain was due to a problem with the chest wall or ribcage, of which the common causes included bruises, muscle strain from coughing, vomiting or lifting, as well as inflammation of the rib cage from viral infections or arthritis. (R. at 483.) The doctor noted that although icepacks could help with an acute injury, warm moist heat would be of benefit if the symptoms persisted for longer than one or two days. (R. at 483.) The doctor also opined that Woods should quit smoking. (R. at 483.) With regard to her acute bronchitis, the doctor stated that it may be caused by bacterial or viral infections, allergies or inhalations of smoke or other irritating chemicals. (R. at 483.) To treat acute bronchitis, the doctor recommended a number of treatments, including antibiotics, drinking increased fluids, humidifying the air and increased rest. (R. at 483.) On this same day, Woods presented to RMH with the same complaints of left lateral back and side pain that had persisted for a week and a dry cough. (R. at 489-494.)

As is evident from the record, Woods made several visits to two hospitals citing a wide range of symptoms, however, none of these physical examinations included any significant medical findings as to her condition that would render her disabled. (R. at 48-49.) In addition to these treating sources, the ALJ also relied on PRFC's submitted by the state agency physicians. With regard to the testimony of these non-treating physicians, the Fourth Circuit Court of Appeals has indicated that such testimony should be discounted and does not constitute substantial evidence when it is totally contradicted by other evidence in the record. *Martin v. Secretary*, 492 F.2d 905, 908 (4th Cir. 1974). However, the court ruled in *Kyle v.*

*Cohen*, 449 F.2d 489 (4th Cir. 1971), that the testimony of a non-examining, non-treating physician can be used and relied upon if it is consistent with the record. Finally, "if the medical expert testimony from examining or treating physicians goes both ways, an ALJ's determination coming down on the side on which the non-examining, non-treating physician finds himself should stand." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

Dr. Hassan, a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on October 24, 2005. (R. at 388-394.) Dr. Hassan found that Woods could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours in an eight-hour workday and that she had an unlimited ability to push and/or pull. (R. at 389.) Dr. Hassan opined that Woods could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 390.) He imposed no manipulative, visual or communicative limitations. (R. at 390-391.) He did note one environmental limitation, which was to avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 391.)

Dr. Hassan also noted that Woods' subjective allegations were only partially credible. (R. at 393.) Among these subjective allegations made by Woods included claims that she had difficulty lifting, symptoms of pain in her hips and legs, alleged numbness in her legs, pain that shoots from her hip down toward her feet, in addition to leg cramps that move to different locations. (R. at 393.) Dr. Hassan found that Woods' activities of daily living form indicated that she was able to prepare her meals, in addition to performing household chores such as cleaning the house and washing her clothes. (R. at 393.) Dr. Hassan also found that Woods

Case 2:08-cv-00015-GMW-PMS   Document 18   Filed 01/07/09   Page 31 of 37   Pageid#: 82

was able to shop for groceries, read, watch television, talk on the phone and that she got along with authority figures well. (R. at 393.)

On January 4, 2006, Dr. Amos, a state agency physician completed a PRFC. (R. at 467-473.) The PRFC stated that Woods could occasionally lift and/or carry items weighing up to 50 pounds, frequently lift and/or carry items weighing up to 25 pounds, sit, stand and/or walk for a total of six hours in an eight-hour workday and that she had an unlimited ability to push and/or pull. (R. at 468.) It also stated that Woods could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 469.) The PRFC imposed no manipulative, visual or communicative limitations. (R. at 390-469-470.) It did note one environmental limitation, which was to avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 470.)

Dr. Amos also noted that Woods' subjective allegations were only partially credible. (R. at 472.) Among these subjective allegations made by Woods included claims of disability due to asthma, COPD, tendonitis of the left arm, acid reflux and high cholesterol. (R. at 472.) In addition, Woods reported that hip pain, leg numbness and leg cramps caused limitations in her ability to stand, walk, lift, carry, climb, concentrate and complete daily activities. (R. at 472.) The state agency physician found that Woods' activities of daily living form indicated that she was able to prepare her meals, in addition to performing household chores such as cleaning the house and washing her clothes. (R. at 472.) It also was noted that Woods was able to shop for groceries, read, watch television, talk on the phone and that she got along with authority figures well. (R. at 472.)

32

After reviewing the relevant medical evidence, the undersigned is of the opinion that the ALJ's decision to accord less weight to the opinion of Dr. Huffman is supported by substantial evidence. In this case, despite the limitations noted by Dr. Huffman as one treating source, I find that his opinion was inconsistent with other substantial evidence. Therefore, because the opinion of the treating physician was inconsistent with other substantial evidence of record, the ALJ did not err by according the opinion significantly less weight. *See Craig*, 76 F.3d at 590.

Woods further argues that the ALJ should have recontacted Dr. Huffman prior to rejecting his opinion based on the fact that Dr. Huffman's records are not very informative or detailed, and because his notes prior to January 2001 are not included in the record. (Plaintiff's Brief at 9-10.) As stated earlier, although Woods received consistent treatment from Dr. Huffman beginning January 19, 2001, and allegedly received treatment prior to this date, the relevant time period starts on October 27, 2004, the date that Woods alleges disability. Therefore, the lack of inclusion of notes prior to January 2001 is immaterial to this decision. Therefore, the only plausible argument is that Dr. Huffman's treatment notes dating back to the onset date were inadequate because, as Woods claims, the notes were not detailed or informative.

Social Security Act, § 223(d)(1)(A) states:

If an ALJ determines that a treating physician's records are *inconclusive or otherwise inadequate* to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the social security disability claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with the regulation governing the recontacting of medical sources.

Social Security Act, § 223(d)(1)(A), as amended, 42 U.S.C.A. § 423(d)(1)(A); 20 C.F.R. § 404.1512(e). In this case, the ALJ never came to the conclusion that Dr. Huffman's records were either inconclusive or otherwise inadequate to receive controlling weight. (R. at 53.) The assertion made by Woods that Dr. Huffman's treatment notes were "not very informative or detailed" is merely a personal opinion and not the opinion of the ALJ. The ALJ refused to give controlling weight to Dr. Huffman's assessments because "[t]hese assessments lack consistency and support with the other evidence of record, including Dr. Huffman's own treatment records, and where obviously based on the claimant's subjective complaints." (R. at 53.) Therefore, the ALJ properly concluded, in light of the evidence in the record, that Dr. Huffman's opinion was inconsistent with other evidence of record, and should therefore be accorded lesser weight.

Woods also argues that the ALJ erred by failing to give full consideration to the findings of Dr. Huffman as to the severity of Woods' mental impairments and the resulting affects on Woods' work ability. (Plaintiff's Brief at 10-11.) As shown in the record, Dr. Huffman completed a Medical Assessment of Ability to do Work-Related Activities (Mental) on January 11, 2005, where he opined that in the category of making occupation adjustments, Woods had an unlimited/very good ability to follow work rules, relate to co-workers, interact with supervisors and deal with work stresses; a good ability to deal with the public; a fair ability to use judgment with the public and function independently; and a poor/none ability to maintain attention and concentration. (R. at 296.) In the category of making performance adjustments, Dr. Huffman opined that Woods had a good ability to understand, remember and carry out simple job instructions and a poor/none ability

34

to understand, remember and carry out complex job instructions and detailed, but not complex, job instructions. (R. at 297.) In the category of making personal-social adjustments, Dr. Huffman opined that Woods had an unlimited/very good ability to behave in an emotionally stable manner and demonstrate reliability and good ability to maintain personal appearance and relate predictably in social situations. (R. at 297.)

The ALJ was not required to give controlling weight to Dr. Huffman's opinion. As stated earlier, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. In this case, the ALJ concluded that there was no evidence in the record that showed a medically determinable mental impairment and found Dr. Huffman's opinion to be inconsistent with other objective evidence of record. (R. at 50.) The ALJ noted that Woods had no history of mental health treatment and stated that Woods was not taking medication for treatment of mental problems. (R. at 50.) In addition, the ALJ noted that Woods did not allege any mental health problems in a Disability Report completed as a requirement for her disability claim and that Woods did not identify any mental impairments as a basis for her inability to work. (R. at 50.)

Woods further argues that the ALJ was required to adopt Dr. Huffman's assessment of Wood's mental work-related limitations because it was the only assessment of Woods' mental limitations. Woods states that since the RFC is a medical assessment, the ALJ is not qualified to make this assessment without some expert medical testimony or other medical evidence to support his decision.

Case 2:08-cv-00015-GMW-PMS    Document 18    Filed 01/07/09    Page 35 of 37    Pageid#: 86

However, according to 20 C.F.R. §§ 404.1527(e), 404.1546(c), 416.927(d) "the ALJ is responsible for making a residual functional capacity determination based on the medical evidence, and he is not required to seek a separate expert medical opinion." In addition, a claimant must prove that her impairments "are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1527(a), 416.927(d). In this case, the evidence submitted to the ALJ was sufficient to support his conclusion that Woods did not suffer from a medically determinable mental impairment. As stated above, the ALJ noted that Woods was not taking medication for treatment of mental problems and she did not allege any mental problems in her Disability Report. (R. at 50.) In addition, the ALJ noted that Woods' daily activities suggested "adequate concentration and mental functioning to perform basic work tasks." (R. at 50.) Therefore, because there is sufficient evidence to support the ALJ's conclusion that Woods does not suffer from a medically determinable mental impairment, the ALJ was not required to adopt Dr. Huffman's opinion simply because it was the only medical opinion of record regarding Woods' mental limitations.

Therefore, the ALJ was correct to award little weight to Dr. Huffman's mental work-related limitations, as such a conclusion was inconsistent with the other evidence of record, including Dr. Huffman's own treatment records. (R. at 53.) The ALJ also cited numerous laboratory tests and clinical findings that were inconsistent with the limitations found by Dr. Huffman. (R. at 53.)

Case 2:08-cv-00015-GMW-PMS   Document 18   Filed 01/07/09   Page 36 of 37   Pageid#: 87

*IV. Conclusion*

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment and deny Woods's motion for summary judgment.

An appropriate order will be entered.

**ENTER:** This 7th day of January, 2009.

/s/ **Glen M. Williams**
**SENIOR UNITED STATES DISTRICT JUDGE**

Case 2:08-cv-00015-GMW-PMS   Document 18   Filed 01/07/09   Page 37 of 37   Pageid#: 88